# UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

*FILED US DISTRICT COURT WESTERN DIST ARKANSAS NOV 16 2017 By DOUGLAS F. YOUNG, Clerk Deputy Clerk*

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 2:17-CM-28
THE CELLULAR TELEPHONE ASSIGNED CALL )
NUMBER 205-862-5088 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT "A," This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41

located in the ____Unknown____ District of ____Unknown State____ , there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1956 | Money Laundering |

The application is based on these facts:

☑ Continued on the attached sheet.
☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

HSI SA D. Vence Carmack
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/16/17

*Judge's signature*

City and state: Fort Smith, Arkansas      U.S. Magistrate Judge Mark E. Ford
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR GPS PING WARRANT

I, David V. Carmack, Special Agent with Homeland Security Investigations (HSI), being duly sworn, depose and state that:

### Introduction

1. I am a Special Agent (SA) of Homeland Security Investigations (HSI) and have been so since July of 1997. I am currently assigned to the Fort Smith, Arkansas, Resident Agent in Charge Office (RACFB). Since June of 2010 I have been assigned to the Drug Enforcement Administration (DEA) as a federal partner of their drug task force in Fort Smith, Arkansas. In connection with my official HSI duties, I investigate criminal violations of the Controlled Substances Act. I have received specialized training in the enforcement of federal narcotics laws. My training and experience have involved, among other things, (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, and of the laundering and concealment of proceeds of drug trafficking; (b) surveillance; and (c) analysis of documentary and physical evidence. I have also received training in investigations involving the interception of wire and electronic communications. I have been the case agent and the Affiant on three Title III Affidavits for wire and electronic communication intercepts. Based on my training and experience, I have become familiar with the manner in which narcotics traffickers conduct their drug-related businesses, including the methods employed by narcotics dealers to import and distribute narcotics, and their use of coded language to refer to narcotics, drug proceeds, and other aspects of narcotics trafficking. I have also received specialized training from HSI and DEA relating to the investigation of money laundering offenses. I have been personally involved in investigations involving not only the unlawful possession, manufacture, and distribution of controlled

substances, including cocaine, methamphetamine, marijuana, but I have also been personally involved in investigations concerning the related offense of money laundering. Some of these investigations also involved the commission of other financial crimes. Prior to becoming an HSI Special Agent, I worked as a police officer for the Clarksville, Tennessee Police Department.

2. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (205) 862-5088, the Target Telephone, whose service provider is T-Mobile, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey 07921. The Target Telephone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

3. The information presented herein is derived from the Affiant's personal observations and investigations, from review of reports and other information provided by law enforcement agencies. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. Section 1956, Money Laundering, have been committed, are being committed, and will be committed by the user of this Target Telephone. Further, based upon the information set forth in this affidavit, there is probable cause to believe that this telephone is being used by Husam Mahomoud a/k/a Husam Mohomoud a/k/a Husam Mahmud Turki-Joudeh, to facilitate the commission of money laundering offenses, and there is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

## Background and Probable Cause

5. In early 2008, a DEA Confidential Source (CS) provided information regarding the activities of an international money laundering/hawala organization led by Mohammed Al Shafiq, a subject who resided in Jordan and is believed to be a Jordanian national. The CS also provided names, telephone numbers and other information that enabled DEA agents to identify other leaders within this organization as well as businesses in the U.S. associated with this organization. In March of 2008, that same CS related to DEA agents that Al Shafiq called the CS from Jordan and told the CS to call "Hussam Salman" on phone number 205-862-5088, the Target Telephone. "Hussam Salman" was identified as Husam Mahomoud, who continues to use the Target Telephone today. For the remainder of this Affidavit, "Hussam Salman" will be referred to as Mahomoud. Al Shafiq told the CS to call Mahomoud and to introduce himself/herself to Mahomoud. It was relayed to the CS that Mahomoud was the person that the CS needed to contact to coordinate the transfer of any monies through Al Shafiq's hawala system.[1] No charges were filed related to this phase of the investigation.

6. The current investigation into Husam Mahomoud has revealed that he is a naturalized US citizen with a US passport that was issued in Amman, Jordan. His original US immigration records were difficult to locate. Several attempts were made by various US federal law enforcement agencies over a month long period, which produced negative results, but eventually an extensive search by a United States Citizenship and Immigration Services Officer, Officer Alma Rico, yielded two different Alien Registration files under the "A numbers" of

---

[1] The term "hawala" is used in this context to refer to an international network of non-bank financial agents, who work together due to trusted familial or cultural relationships. In most cases, the funds themselves are never transferred, just messages relating to receipt or disbursement of funds. These underground systems are exploited by terrorists and other financial criminals because it allows them to remain anonymous and also because no official records are kept of the financial transactions conducted by hawalas.

A013755036 and A036437706. A review of Mahomoud's Alien Registration Files revealed the following: that he was actually born in Bogota, Colombia on October 11, 1963 to a Colombian mother and a Jordanian father; that his birth name was Husam Mahmud Turki-Castro; that he first arrived in the US and was admitted to the US with an Immigrant Visa and Alien Registration (form FS-511) on 3/15/1964; that all the associated US INS and Colombian paperwork show his name at the time as Husam Turki-Castro or Husam Mahmud Turki-Castro with a date of birth of October 11, 1963; that on or about 3/10/1980, Mahomoud's's father changed Mahomoud's's name from Husam Mahmud Turki-Castro to Husam Mahmud Turki-Joudeh; that Mahomoud obtained his US Certificate of Citizenship (form N-560) on March 12, 1980, and his Form N-560 stated his date of birth as October 11, 1963.

7. Mahomoud has a current driver's license issued by the state of Alabama. The number is 7190434, and his name is listed on the license as Husam Mahomoud with a date of birth of January 1, 1963. He previously had driver's license number M530-330-63-001-0. This driver's license was issued by the state of Florida in 1998, and lists his name as Husam J. Mahomoud with a date of birth of January 1, 1963.

8. Subpoenaed financial records for Mahomoud's purchase of a residence in Richmond, TX in 2016 contained a copy of his Social Security card listing his full name as "Husam Joudeh Mahmoud", another variation of his name. On July 14, 2017, the DEA Cartagena office provided a copy of Mahomoud's Colombian cedula and national identification number (DNI), which revealed that Mahomoud renewed his Colombian DNI on May 25, 2017 at the Colombian consulate outside of Atlanta, GA, and that document shows Mahomoud's name as Husam Turki-Castro with a date of birth of October 11, 1963 and Colombian DNI# 79552213.

9. Based on my training and experience, I know that money launderers and other subjects engaged in criminal activities will frequently use multiple aliases and multiple dates of birth in an attempt to thwart law enforcement officials' ability to fully identify them, and to also make it more difficult for law enforcement to learn about the subjects' prior licit and illicit activities. Further, as a result of my training and experience, I know that the use of multiple dates of birth, and aliases by those engaged in criminal activity also make it more difficult for law enforcement to track their domestic and international travel movements.

10. The financial investigation into Mahomoud has thus far revealed that he either wholly or partially owns numerous corporate entities. In Arkansas, and in other states, these entities contain the words "Xcell Communications" within the full name of the legal entity, and they do business as cellular telephone retail businesses. In the Western District of Arkansas, this entity conducts business as "Metro-PCS" stores. Mahomoud also owns other corporate entities including "Sukar and Sons of Atlanta, Inc." The companies under the umbrella of this entity also do business as "Metro PCS" retail stores in Georgia.

11. On August 16, 2017, the state of Arkansas Department of Finance and Administration provided records pursuant to a subpoena that had been previously issued in the Western District of Arkansas. The subpoena requested sales tax records and related information for XCELL COMMUNICATIONS OF OK, INC. XCELL COMMUNICATIONS OF OK, INC. is a business registered with the Arkansas Secretary of State. The Arkansas Secretary of State records list Husam Mahomoud as the president and registered agent for this entity. His last name is spelled as "Mohomoud" as the registered agent. Related records were obtained that show Mahomoud owns and operates four METRO-PCS stores in Fort Smith, Arkansas, in the Western District of Arkansas under the entity XCELL COMMUNICATIONS OF OK, INC. Records

subpoenaed and received from Simmons Bank show that Husam Mahomoud opened six bank accounts with Simmons Bank for XCELL COMMUNICATIONS OF OK, INC in Fort Smith, Arkansas on June 17, 2016.

12. Agents reviewed subpoenaed records from the Arkansas Department of Finance and Administration and did not find any record of sales taxes paid by XCELL COMMUNICATIONS OF OK, INC between June 2016 and November 2016, yet subpoenaed Simmons Bank records show cash deposits and Bank of America merchant services deposits (indicating credit sales) for several of the XCELL COMMUNICATIONS OF OK, INC. bank accounts from July through November 2016.

13. One of the XCELL COMMUNICATIONS OF OK, INC.'s Simmons Bank accounts, account number ending in 1270, shows only cash deposits and no deposits from credit sales for the months of September 2016 through July 2017 with frequent transfers during the month from the account ending in 1270 to another XCELL COMMUNICATIONS OF OK, INC.'s Simmons Bank accounts, bank account number ending in 0886. The other four Simmons Bank accounts utilized by XCELL COMMUNICATIONS OF OK, INC show a blend of cash deposits and credit sales deposits, which is typical of a retail store's operations.

14. Furthermore, the sales tax and bank records discussed above indicate that from June 2016 thru July 2017 XCELL COMMUNICATIONS OF OK, INC. had bank deposits of $2,199,785.00 and claimed gross sales over that same period of only $1,191,485.00 which is $1,008,300.00 less than the bank deposits. One of XCELL COMMUNICATIONS OF OK, INC's Simmons Bank accounts, account number ending in 0886, appears to receive deposits from the other five Simmons Bank accounts, and therefore, that account's deposits are not included in the above calculation. Even when counting only those deposits from December 2016

through July 2017, bank deposits total $1,726,633.00 which is $535,148.00 greater than the previously mentioned reported gross sales of $1,191,485.00 over that same period. Once again, Simmons Bank account number ending in 0886 is excluded from this calculation.

15. During the months of May, June and July 2017, there were several Currency Transaction Reports ranging from approximately $11,000.00 to $17,000.00 filed by Simmons Bank in Fort Smith, Arkansas. These reports state that there were two persons involved in making each transaction, Husam Mahomoud and XCELL COMMUNICATIONS OF OK, INC. The telephone number, 205-862-5088 (Target Telephone), listed on these reports as being associated with Mahomoud and XCELL COMMUNICATIONS OF OK, INC. is the same number that Mahomoud used back in 2008, when he laundered the $50,000.00 in DEA Official Funds. Agents believe, based on the investigation up to this point, that Mahomoud continues to use this number to communicate, and this number is used to further his illegal activity.

16. Based on my training and experience, I know that it is common for a money launderer to transfer significant sums of money from one account to another to make it more difficult to determine the origin of the funds and also to give the money an appearance of legitimacy. Depositing the money into the bank account is referred to as "placement", the first step in laundering money, and then transferring money between accounts is referred to as "layering, which is the second step in laundering money. I also know, based on my training and experience that that money launderers and other subjects engaged in criminal activities will "blend funds" by co-mingling illicit funds with the day's legitimate sales receipts. It is my belief, based on my training and experience, that the large discrepancy between Mahomoud's deposits and the reported gross sales from his Fort Smith Metro-PCS stores is indicative of criminal activity. This behavior coupled with the purely cash deposits from September 2016 to

July 2017 in the Simmons Bank account ending in 1270 and the frequent transfer of funds out of this account into his Simmons Bank account ending in 0886 indicate the following: (1) Mahomoud has an unidentified and unreported significant source of cash income; and (2) that he is using multiple bank accounts in the Western District of Arkansas and elsewhere to facilitate the movement of these funds. Based on my training and experience, these activities on the part of Mahomoud are highly indicative of money laundering, efforts to evade the tax laws, structuring, and other currency reporting laws.

17. The requested warrant is needed to assist agents in identifying the source of the unidentified income and to fully develop the scale of Mahomoud's criminal activity. In addition to the information detailed in the above paragraphs, Mahomoud owns numerous other businesses throughout the United States and appears to travel between states in the United States and also abroad to further his activities. The requested warrant will aid agents in identifying and conducting surveillance of Mahomoud. GPS location data will allow agents and officers to more accurately determine locations used by Mahomoud to facilitate his money laundering related activities, to identify locations used by Mahomoud for meetings with co-conspirators, to identify locations utilized by Mahomoud to store illicit cash proceeds pending the process of its placement into a financial institution or other entity as part of the first stage of money laundering, to identify all criminal activities conducted by Mahomoud, and determine the scope of his enterprise. Based upon the information outlined above, which indicates that Mahomoud is involved in the laundering of illicit cash proceeds and that the "Target Telephone" is being used by Mahomoud, I seek the Order described herein, to assist in the investigation of Mahomoud and the identification of his co-conspirators.

18. On October 25, 2017, the Honorable Mark E. Ford, United States Magistrate Judge for the Western District of Arkansas, Fort Smith Division, authorized a GPS location search and seizure warrant on the Target Telephone that enabled investigating agents to receive the location information for the phone used by Mahomoud. All court documents related to this warrant are currently under seal in case number 2:17CM23. While the location information received over the past several weeks has been helpful to the investigation, it has not allowed agents to determine the activity and behavior patterns of Mahomoud. This is in part because Mahomoud traveled out of the country during this time. Mahomoud traveled from Atlanta, Georgia to Bogota, Colombia on November 1, 2017, and he returned to Atlanta from Bogota on November 7, 2017. While Mahomoud was in Colombia, agents did not receive any geo location information. However, upon his arrival back to Atlanta from Bogota, Customs and Border Patrol Agents made contact with Mahomoud. They were able to extract recent contacts from his phone. They also discussed the nature of his travel with him. Of note, Mahomoud advised that he owns 150 Metro PCS stores and that he previously owned 40 Cricket stores, but he had sold those. The information related to the Cricket Stores was not previously known by agents. As to the extracted recent phone contacts, agents are developing that information as well. During the period authorized by 2:17CM23, due to the GPS location warrant, agents were able to determine that Mahomoud traveled to the Houston area, Birmingham area, and Montgomery area, in addition to the international travel referenced above.

19. Further, also during the period of time authorized by the warrant, agents were able to locate and reconnect with the CS listed in paragraph 5 of this affidavit. At the direction of agents, the CS placed a recorded call to the Target Telephone and had a recorded conversation with Mahomoud that lasted approximately seven minutes. Agents hope that the CS, at the

direction of law enforcement, can continue to reconnect with Mahomoud and through these communications, the investigation can be furthered. Additionally, agents located and identified Mahomoud's Facebook page and plan to develop the information contained there was well. The financial investigation is ongoing. Over one-hundred bank accounts have been identified by agents as accounts used by Mahomoud or accounts tied to his entities.

20. By way of this Application and Affidavit, agents are seeking authorization to obtain the GPS location information for the Target Telephone for an additional thirty days, as the investigative goals that relate to receiving the GPS location information have not been met yet and agents were set back almost an entire week when Mahomoud traveled to Colombia. Agents need more time to develop Mahomoud's travel and behavior patterns and this will also lead to the identification of his co-conspirators. The requested GPS location information will assist agents in these tasks

21. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone

connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

22. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the Target Telephone, including by initiating a signal to determine the location of the Target Telephone on the T-Mobile network or with such other reference points as may be reasonably available

23. Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Telephone.

### Conclusion and Authorization Request

24. Based on the foregoing, I request that the Court issue the proposed search warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

25. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the

extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2). Agents are not seeking authorization to intercept the content of communications occurring on the Target Telephone at this time.

26. I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the services provided by T-Mobile, including by initiating a signal to determine the location of the Target Telephone on the T-Mobile network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

27. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

28. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

David V. Carmack
Special Agent
Homeland Security Investigations

AFFIDAVIT subscribed and sworn to before me this __16th__ day of November, 2017.

Mark E. Ford
U.S. Magistrate Judge

## ATTACHMENT A

**Property to Be Searched**

The cellular telephone assigned call number (205) 862-5088 (Target Telephone) whose wireless service provider is T-Mobile, a company headquartered at 180 Washington Valley Road Bedminster, New Jersey 07921; and information about the location of the Target Telephone that is within the possession, custody or control of T-Mobile.

## ATTACHMENT B

**Particular Things to be Seized**

All information about the location of the Target Telephone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the services provided by T-Mobile, including by initiating a signal to determine the location of the Target Telephone on the T-Mobile network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a (b)(2).